Joann **REED**, Appellant,

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Appellee.**

No. 04–1197.

United States Court of Appeals,
Eighth Circuit.

Submitted: Sept. 17, 2004.

Filed: March 8, 2005.

918

Joanna Davis, argued, Springfield, MO (Jon M. Gold, on the brief), for appellant.

Richard Staples, argued, Office of General Counsel, Social Security Admin., Kansas City, MO (Ann K. Reeg, Office of General Counsel, on the brief), for appellee.

Before WOLLMAN, RICHARD S. ARNOLD,[1] and BYE, Circuit Judges.

WOLLMAN, Circuit Judge.

Joann Reed appeals from the district court's order affirming the final decision of the Commissioner of Social Security, which denied her applications for disability insur-

---

1. The Honorable Richard S. Arnold died on September 23, 2004. This opinion is being filed by the remaining judges of the panel pursuant to 8th Cir. Rule 47E.

ance benefits and supplemental security income. We reverse and remand.

## I.

Reed was born on September 2, 1959. Though she did not attend school beyond the tenth grade, she has obtained her General Education Diploma. Reed has been diagnosed with an anxiety-related disorder, post-traumatic stress disorder, depression, migraine headaches, and degenerative disc disease of the lumbar spine. At the hearing before an Administrative Law Judge (ALJ), Reed testified that she last worked in December of 1994 or thereabouts and had to quit because of her back. "I couldn't handle the sitting," she stated. In 1997, one of her husband's friends raped and beat Reed and then abandoned her in a field. Since the attack, Reed has suffered from frequent anxiety attacks and nightmares and has been prescribed medications for depression, anxiety, and insomnia. Reed's treating physician, a psychiatrist by the name of Dr. Antonio Dimalanta, provided a Medical Source Statement (MSS) indicating that Reed was markedly limited in her ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, and travel in unfamiliar places or use public transportation. He further indicated that she was extremely limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.

Reed testified that she was evicted from her apartment for not paying rent and had moved in with her mother-in-law. Her allocation of $248 in food stamps was reduced to $10 when her husband took a job as a cashier. She further stated that she does not have a driver's license and that she relies on friends or taxis for transportation. Reed described herself as capable of preparing her own meals, feeding two dogs, and doing "a little bit of crafts," including stamping, making cards, and some beadwork. She does crafts to "keep busy," but can stay with them for only about an hour before losing focus and getting frustrated. Reed described her other activities and capabilities as follows: Though she does the laundry, she cannot carry the basket; she sometimes has difficulty using her hands for gripping and holding things, and sometimes her appendages go numb; she cannot vacuum the floor or clean the bathtub or shower, but considers herself "probably" able to take out the trash; she can make the bed, but cannot change the sheets. Reed does not belong to any club, organization, or church.

Read stated that she can lift five to ten pounds, sit for twenty minutes, stand for ten to fifteen minutes, and walk one block. Harold Davidson, the vocational expert, identified Reed's past work to include stints as a sales attendant, cashier, assembler, packager and nurse's aid, in addition to her last job as a microfilmer. The ALJ asked Davidson whether an individual of the same age, education, and work history as Reed could perform Reed's past work, assuming an ability to do the following: lift ten pounds frequently and twenty pounds occasionally; stand or walk six hours of a day and sit six hours a day with normal breaks; and occasionally stoop. The ALJ further asked Davidson to rule out stressful environments, such as deadlines and fast-paced activity, and to assume that the person could not perform work that required "sustained attention to detail." Davidson responded that such a person could not perform Reed's past relevant work, but that they could work as a hand packager or assembly worker. Davidson went on to specify that for unskilled hand packagers able to engage in light activity, 8,000 jobs could be found in Missouri and

105,000 could be found nationally. For those who required a sedentary activity level, 1,100 such jobs could be found in Missouri. In terms of unskilled assembly jobs with light or sedentary activity levels, 3,000 and 1,100, respectively, could be found in Missouri; 117,000 and 39,000 could be found nationally.

The ALJ then asked Davidson whether such a person could perform these jobs if that person was markedly limited in the ways described by Dr. Dimalanta. Davison answered that such a person would be incapable of performing the packaging and assembly work discussed. Davidson commented that the extreme limitation noted in Reed's "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," Ex. 13F, implicated the qualities of "sustained concentration and persistence which [are] heavily weighted in terms of the average workers." "And with that limitation," Davidson concluded, "that would essentially prevent a person from sustaining [the] work that I gave you."

Following the ALJ's determination that Reed was not disabled, the Appeals Council denied review of the ALJ's decision. As set forth above, Reed now appeals from the district court's affirmance of the Commissioner's decision denying Reed's claim for benefits.

## II.

We review *de novo* a district court decision affirming a denial of social security benefits. *Strongson v. Barnhart*, 361 F.3d 1066, 1069 (8th Cir.2004). "[W]e must affirm the Commissioner's decision so long as it conforms to the law and is supported by substantial evidence on the record as a whole." *Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 729 (8th Cir.2003).

Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion," whereas substantial evidence on the record as a whole entails "a more scrutinizing analysis." *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir.1989); *see also Burress v. Apfel*, 141 F.3d 875, 878 (8th Cir.1998) (noting that the "substantial evidence in the record as a whole" standard is more rigorous than the "substantial evidence" standard). "[O]ur review 'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision[;] we also take into account whatever in the record fairly detracts from that decision.' " *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir.2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir.1995).

Reed first asserts that the ALJ failed to give controlling weight to the opinion of her treating psychiatrist, Dr. Dimalanta, thereby contradicting the rules established in SSR 96–2p and 20 C.F.R. § 404.1527. Second, Reed claims that the ALJ did not explain the evidence he relied upon in developing her Mental Residual Functional Capacity ("MRFC") in violation of SSR 85–16.

 Reed contends that the ALJ "provided no rationale for disregarding" Dr. Dimalanta's opinion. "[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir.2002). A treating physician's opinion "do[es] not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir.1995). "[W]e have upheld an ALJ's decision to

discount or even disregard the opinion of a treating physician where other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir.2000).

■ The ALJ noted several grounds for his conclusory rejection of the MSS completed by Dr. Dimalanta. The ALJ first stated that he "considers such evaluation by 'box' category' [sic] to be deficient." The relevant question is not whether the ALJ, on a personal level, considers this method of evaluation deficient, but rather whether there exists a principled reason to reject it. An MSS is a checklist evaluation in which the responding physician ranks the patient's abilities, and is considered a source of "objective medical evidence." *Burress*, 141 F.3d at 879. We have upheld an ALJ's decision to discount a treating physician's MSS where the limitations listed on the form "stand alone," and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning." *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir.2001); *see also Strongson*, 361 F.3d at 1071 (affirming the ALJ's decision to give little weight to an MSS where the completing physician's opinion was "without explanation or support from clinical findings" and "not internally consistent with [his] own treatment notations"). We have never upheld a decision to discount an MSS on the basis that the 'evaluation by box category' is deficient *ipso facto*.

■ Second, the ALJ disregarded Dr. Dimalanta's opinion on grounds of inconsistency.

"[Dr. Dimalanta's] choices are not consistent, since he indicates claimant is 'not significantly' limited in the ability to remember locations and work-like proce-

dures, or in the ability to understand and remember very short and simple instructions, or in the ability to carry out very short and simple instructions, but is 'markedly' limited in the ability to maintain attention and concentration for extended periods."

The regulations require that the ALJ "always give good reasons" for the weight afforded to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2); *Dolph*, 308 F.3d at 878–79. We cannot conclude that the ALJ has done so here. A marked limitation in the ability to maintain attention and concentration for extended periods is not inconsistent with an ability to remember locations or work-like procedures, or understand, remember, and carry out very short and simple instructions. Instructions that are by nature short and simple would not seem to pose a problem for someone who can maintain their attention and concentration for only short periods. Similarly, it is unclear how the ability to remember a location or a procedure is inconsistent with an inability to maintain attention or concentration for extended periods of time. Absent some explanation for finding an inconsistency where none appears to exist, we do not consider Dr. Dimalanta's opinions in this regard to be examples of "inconsistent opinions that undermine the credibility of such opinions." *See Prosch*, 201 F.3d at 1013 (explaining how an opinion by the treating physician that the claimant had been disabled since 1990 was "suspect," given that the same physician had, on the basis of the same information, concluded three weeks earlier that the claimant had been disabled since 1976).

■ the ALJ faulted Dr. Dimalanta's basis of knowledge for the MSS, concluding that "[Dr. Dimalanta's] records fail to provide any explanation for the choices, and, in fact, reveal very little in

the way of objective or structured testing." The ALJ concluded that the medical evidence indicates that Reed suffers from anxiety-related disorder, post-traumatic stress disorder, depression, and migraine headaches. Besides Dr. Dimalanta's reliance on his knowledge of Reed's diagnoses with these conditions (many of which he listed in his records that were faulted by the ALJ), Reed's success with various medications that he prescribed, the results of the therapy he gave her, his documentation of her history, and his observations during multiple face-to-face visits with her, it is unclear what other tests should have been relied upon by Dr. Dimalanta so as to render his conclusions credible. Dr. Dimalanta's treatment notes are consistent with his conclusions on the MSS. He noted, for example, that Reed "struggles taking care of herself because it seems unnatural [to her]," "still struggles with sleep" despite medication, was "afraid to see me . . . because she was not able to do the homework I asked her to do," "has crowd intolerance," and "is tearful." Ex. 6F. These observations provide support for Dr. Dimalanta's conclusion on the MSS that Reed is extremely limited in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms." In discounting the state agency medical consultant's opinion that Reed had only "mild difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence and pace," the ALJ noted that "[s]ubsequent evidence has indicated that [Reed's] mental impairment has more than a minimal effect upon her functional capacity."

In *Dolph*, we upheld an ALJ's decision to accord less weight to the opinion of a treating physician who had treated the claimant for kidney disease where the matter at issue pertained to the claimant's cervical condition. *See id.* There, the

ALJ noted that the treating physician had "not treated the claimant for her neck and arm disorders, he ha[d] not made any clinical findings concerning those impairments, and his specialty is nephrology." *Id.* at 879. In light of this, it was proper for the ALJ to rely principally upon the opinions of other physicians who had seen the claimant and whose areas of expertise coincided with the condition at issue. *See id.* These are indeed "good reasons," and they stand in marked contrast to those relied upon by the ALJ in his explanation for discounting Dr. Dimalanta's opinion.

### III.

We turn then to the question whether the ALJ failed to explain the evidence he relied upon in developing Reed's MRFC in violation of SSR 85–16. "The ALJ must determine a claimant's RFC based on all of the relevant evidence." *Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir.2004). This includes "an individual's own description of [her] limitations." *McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir.2003). "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individual's strengths and weaknesses." SSR 85–16. SSR 85–16 further specifies that "consideration should be given to . . . the [q]uality of daily activities . . . [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered."

After mentioning several of Reed's activities, such as fixing meals, watching movies, checking the mail, and doing laundry, the ALJ noted that Reed's "ability to perform them to any degree is inconsistent with her allegations of constant, debilitating symptoms." Four paragraphs earlier,

the ALJ noted Reed's testimony to the effect that she could lift 5–10 pounds, sit for 20 minutes, stand for 10–15 minutes, and walk one block. He further noted Reed's professed symptoms specifically relevant to her mental residual functional capacity: anxiety and panic attacks, difficulty sleeping, loss of concentration, nightmares and flashbacks, and discomfort when around strangers. Reed's testimony about her symptoms hardly seems inconsistent with her ability to perform such routine and simple daily living activities "to any degree." Moreover, it is well-settled law that "a claimant need not prove she is bedridden or completely helpless to be found disabled." *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989); *Gold v. Secretary of Health, Education and Welfare,* 463 F.2d 38, 41 n. 6 (2d Cir.1972); *Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir.1963). Citing *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir.1984), the ALJ noted that "[s]ubjective complaints are subject to being discounted if there are inconsistencies in the evidence as a whole." We find no such inconsistency, however, in Reed's ability to engage in the activities she described. This is especially so, given the "limitations of her ability to perform many of these activities" alluded to but not explained by the ALJ. These limitations are notable: she does "a little bit of crafts," but within an hour she is frustrated because of her inability to concentrate; she can make the bed, but not put on fitted sheets; she can do household chores, but cannot vacuum the floor or clean the bathtub; she can do the laundry but cannot carry the laundry basket; and, while she can go grocery shopping, she does so only "if forced," only with her mother-in-law, and only as long as they do not stay long.

■ Following his truncated discussion of Reed's activities, the ALJ concluded as follows: "Considering these factors, the undersigned does not find the record to be supportive of the claimant's allegations that her symptomatology would preclude her from performing any work." It is necessary from time to time to "remind the Secretary that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Thomas,* 876 F.2d at 669 (*citing McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)). This admonition underscores that portion of SSR 85–16 which references the need to consider the frequency and independence of activities performed by the claimant, as well as the claimant's ability to sustain these activities over a period of time.

Furthermore, we must guard against giving undue evidentiary weight to a claimant's ability to carry out the activities incident to day-to-day living when evaluating the claimant's ability to perform full-time work. The ALJ not only considered the effects of Reed's activities on her "allegations of constant, debilitating symptoms," but on her "allegations that her symptomatology would preclude her from performing any work" as well. Although "[a]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility," *Johnson v. Apfel,* 240 F.3d 1145, 1148 (8th Cir. 2001), "this court has repeatedly observed that 'the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.'" *Burress,* 141 F.3d at 881; *see also Banks v. Massanari,* 258 F.3d 820, 832 (8th Cir.2001) ("How many times must we give instructions that [watching television, visiting friends, and going to church] do not indicate that a claimant is able to work full time in our competitive economy?"). As noted above, and consis-

tent with our oft-expressed skepticism about the probative value of evidence of day-to-day activities, we do not consider Reed's daily living activities to be inconsistent with her alleged disability. Moreover, the limitations in Reed's daily living activities that bring her within the reach of *Banks* and *Burress,* as quoted above, and the ALJ's failure to consider the quality, frequency, and independence of these activities, as required by SSR 85–16, render suspect the use of these activities as probative evidence of Reed's ability to work. Since "a claimant need not prove she is bedridden or completely helpless to be found disabled," *Thomas,* 876 F.2d at 669, the import of Reed's ability to carry out daily activities must be assessed in the light of the record-supported limitations on her ability to perform real-world work.

All things considered, then, we conclude that the judgment must be reversed and the case remanded to the district court with directions that the case be remanded to the Commissioner for further proceedings consistent with the views set forth in this opinion.

It is so ordered.